UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JEROME FORD AUSTIN, JR.,

                    Plaintiff,

        - against -

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-331 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Jerome Ford Austin Jr., proceeding *pro se*, commenced this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). Before the Court are the parties' cross-motions for judgment on the pleadings.[1] (Dkts. 10, 12.) For the following reasons, the Court grants Plaintiff's cross-motion for judgment on the pleadings and denies the Commissioner's motion. This case is remanded for further proceedings consistent with this Memorandum & Order.

---

[1] "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to 'raise the strongest arguments that they suggest.'" *Dowsett v. Comm'r of Soc. Sec.*, No. 07-CV-2018 (SLT) (SMG), 2017 WL 2799852, at *1 (E.D.N.Y. June 26, 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). Therefore, the Court construes Plaintiff's Response in Opposition to the Commissioner's Motion (Dkt. 12) as a Cross-Motion for Judgment on the Pleadings, given that Plaintiff "ask[s] the Court to deny the [Commissioner's] motion for judgment on the pleadings, and to award [Plaintiff] disability benefits" or "[a]lternatively, . . . remand my case to the [Administrative Law Judge] for further development of the record." (Plaintiff's Response in Opposition ("Pl.'s Br."), Dkt. 12, at 1.)

## BACKGROUND

**I.     Non-Medical Evidence**

Plaintiff was born on November 2, 1982. (Administrative Transcript, ("Tr."), Dkt. 9, at ECF[2] 282.) He completed his GED in 2000. (*Id.* at ECF 334.) He completed one year of college subsequent to receiving his secondary school diploma. (*Id.* at ECF 113–14.) He was gainfully employed from 2000 to 2011, working as a restaurant cashier from 2000 to 2001 and 2002 to 2003, as a supermarket clerk from 2001 to 2002, as a security officer from 2003 to 2006, and as a police officer for a hospital from 2006 to 2011. (*Id.* at ECF 293–99, 322.) On July 13, 2011, Plaintiff was involved in a motor vehicle accident. (*Id.* at ECF 438.) Plaintiff was in a second motorcycle accident in August 2014. (*Id.* at ECF 24, 524.)

**II.    Medical Evidence**

Dr. Becker[3] served as Plaintiff's primary care physician starting in October 2007.[4] (*Id.* at ECF 515.) Under Dr. Becker's care, Plaintiff underwent a neurological examination on July 1, 2014, shortly before his second motorcycle accident. (*Id.* at ECF 25, 402, 507.) A nerve

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[3] The record is inconsistent as to whether Plaintiff's doctor was Dr. Gary Becker or Dr. Marvin Becker. (*Compare* Tr. at ECF 34 (list of exhibits for hearing noting that the August 2014 Multiple Impairment Questionnaire and July 2014 to December 2016 office treatment records were for Dr. Marvin Becker), *and id.* at ECF 24 (noting that Plaintiff underwent EMG testing with Dr. Marvin Becker), *with id.* at ECF 515 (listing Gary Becker, MD at the top of the Multiple Impairment Questionnaire).) Plaintiff states that "Dr. Becker was my primary care physician and I saw him and his father, Dr. Marvin Becker, during this time frame for many things, including my recurring MS symptoms of impaired depth perception and eye pain." (Pl's Br., Dkt. 12, at 2.)

[4] At the hearing, Plaintiff testified that he has started seeing a new doctor, Dr. Wertzberger. (Tr. at ECF 45.) Plaintiff noted that he believed his first appointment with Dr. Wertzberger was on July 19, 2017. (*Id.*)

conduction study revealed mild bilateral carpal tunnel syndrome, right hand ulnar neuropathy, problems in right foot tibial and lateral plantar nerves, problems in the left foot peroneal, tibial, and lateral plantar nerves, and lumbar radiculopathy[5] at tibial roots. (*Id.* at ECF 507.) Dr. Bajaj, in a report dated July 21, 2014, noted that Plaintiff had been diagnosed with multiple sclerosis ("MS"), that the diagnosis was confirmed by an MRI, that Plaintiff had lost vision in his left eye, experiences headaches, and had his last optic neuritis[6] attack in 2007. (*Id.* at ECF 508.)

On August 12, 2014, Dr. Becker completed a Multiple Impairment Questionnaire of Plaintiff. (*Id.* at ECF 25, 403, 515–21.) Dr. Becker indicated that his diagnosis was "multiple sclerosis" and "optic neuritis" and that Plaintiff's prognosis included loss of vision in one eye, fatigue, and headaches. (*Id.* at ECF 515.) He noted that he was relying on an MRI of Plaintiff's brain to support his diagnosis. (*Id.* at ECF 516.) Dr. Becker also noted that Plaintiff suffered from daily pain to the "frontal head" precipitated by temperature change and light. (*Id.* at ECF 516–17.) Dr. Becker determined that he had not been able to completely relieve Plaintiff's pain "with medication [and] without unacceptable side effects." (*Id.* at ECF 517.)

Dr. Becker concluded that it would not be medically advisable for Plaintiff to sit or stand/walk continuously in a work environment. (*Id.* at ECF 517–18.) Dr. Becker opined that Plaintiff should stand/walk or sit for no more than one hour during the course of an eight-hour workday. (*Id.* at ECF 517.) Dr. Becker further indicated that Plaintiff's symptoms would likely increase if he were to be placed in a competitive work environment, and that his symptoms

---

[5] "Lumbar radiculopathy is a nerve irritation caused by damage to the discs between the vertebrae." *Jefferson v. Astrue*, No. 06-CV-1729 (MRK) (WIG), 2008 WL 918473, at *2 n.4 (D. Conn. Mar. 11, 2008) (quotations omitted).

[6] "Optic neuritis is inflammation of the optic nerve." *Bozzuto v. Colvin*, No. 16-CV-964 (DFM), 2018 WL 4300022, at *3 n.9 (D. Conn. Sept. 10, 2018) (citing *Dorland's Illustrated Medical Dictionary* 1282 (31st ed. 2007)).

3

interfered with his ability to hold his neck in a constant position, which precluded him from working on a computer. (*Id.* at ECF 519.) Dr. Becker concluded that Plaintiff could not work at a competitive job for a sustained basis, citing severe pain, fatigue, and emotional factors that would require him to take frequent unscheduled breaks every half hour, to miss work more than three times a month, and to avoid temperature extremes and humidity. (*Id.* at ECF 520–21.)

On August 24, 2014, Plaintiff was involved in his second motorcycle accident. (*Id.* at ECF 24, 524.) He suffered from several injuries including an open left knee fracture and a dislocated right knee. (*Id.* at ECF 524.) Plaintiff required surgery on both his right knee and left ankle. (*Id.* at ECF 403.) After being discharged from the hospital, on September 8, 2014, Plaintiff was admitted to the Dr. Susan Smith-McKinney Nursing and Rehabilitation Center to undergo intensive physical therapy. (*Id.* at ECF 554–65.) Plaintiff's initial evaluation noted that he had a fractured fibula, an L2-L4 transverse process fracture, a proximal fracture, asthma, multiple sclerosis, and adequate vision. (*Id.* at ECF 554.) The evaluation also stated that Plaintiff was at high risk for falls and other accidents, and had highly circumscribed mobility (needing a wheelchair, partial bed assistance, and constant assistance dressing). (*Id.*) The evaluation described Plaintiff as being completely unable to walk. (*Id.*)

On October 16, 2014, Plaintiff was discharged from the Dr. Susan Smith-McKinney Nursing and Rehabilitation Center. (*Id.* at ECF 697.) According to the record, the reason cited for the discharge was that "goals [were] met." (*Id.*) Plaintiff's mobility was rated at least one percent but less than 20 percent impaired, with modified independence in turning and scooting in bed and capable of ambulation over even terrain with crutches for 150 feet. (*Id.* at ECF 698–99.) It also described Plaintiff as capable of climbing nine steps on a staircase without the aid of crutches, of dressing his lower body with difficulty, and of performing simple home chores with

4

minimal assistance. (*Id.* at ECF 699, 743–45.) The summary concluded that Plaintiff would still suffer from significant fatigue, with moderate to maximal exertion difficult to recover from. (*Id.* at ECF 740.)

On October 31, 2014, Plaintiff received an initial evaluation at New "U" Physical Therapy. (*Id.* at ECF 841.) Plaintiff demonstrated "decreased [range of motion], decreased [m]uscle strength, decreased [m]obility, limited functions such as walking more than [two] blocks, difficulty with transfers, inability to negotiate more than [five] steps . . . [and] difficulty getting dressed." (*Id.*) Plaintiff's pain was sharp, an eight out of ten at rest, and a nine out of ten with activity. (*Id.*) Additionally, the medial meniscus on both of Plaintiff's knees was tender to palpation. (*Id.*)

On February 5, 2015, Plaintiff underwent a consultative examination conducted by Dr. Lamberto Flores, who specializes in internal medicine. (*Id.* at ECF 4, 26, 403, 796–98.) He acknowledged Plaintiff's history with multiple sclerosis, his left ankle fracture, and his right knee dislocation. (*Id.* at ECF 796.) Dr. Flores noted Plaintiff's claim that he could not tolerate walking five to ten steps without left ankle pain or lift five to ten pounds. (*Id.* at ECF 797.) Dr. Flores also noted Plaintiff's claim that he could tolerate sitting with an elevated leg without pain, prolonged standing for five minutes with knee and ankle pain, and climbing stairs with left ankle pain. (*Id.*) On examination, Dr. Flores described Plaintiff's gait as limping and stated that Plaintiff needed a cane for support, though Dr. Flores found no evidence of swelling or impaired extension. (*Id.* at ECF 798.) Dr. Flores noted that Plaintiff had difficulty doing tandem, toe, and heel walking exercises even with his cane. (*Id.*) Based on the physical examination, Dr. Flores concluded that Plaintiff was limited in prolonged walking, sitting, standing, climbing stairs, and heavy lifting. (*Id.*)

On March 3, 2016, Plaintiff underwent a consultative examination conducted by Dr. Mahendra Misra, a board-certified orthopedist. (*Id.* at ECF 26, 404, 802–12.) In a medical source statement produced subsequent to the examination, Dr. Misra noted that Plaintiff experienced pain and swelling in his right knee joint, making walking difficult. (*Id.* at ECF 802.) Additionally, Dr. Misra noted that Plaintiff experienced pain and swelling in his left ankle joint, which made walking and standing difficult. (*Id.*) However, Dr. Misra noted that Plaintiff's left knee was unremarkable. (*See id.* at ECF 803 ("Left Knee Joint: Status post surgery for a meniscus tear in 2011 but he does not have too many symptoms here.").) Dr. Misra noted Plaintiff's history of multiple sclerosis, adding that he had gone "blind in the right eye." (*Id.*) Dr. Misra diagnosed left knee joint internal derangement, right knee internal derangement, left ankle derangement, multiple sclerosis, and obesity. (*Id.* at ECF 804.) Dr. Misra noted that Plaintiff's prognosis was "[g]uarded." (*Id.*) Dr. Misra recorded that when prompted, Plaintiff was unable to do heel walking, toe walking, or any squatting, though he was able to walk heel-to-toe albeit with a "very heavy limping gait." (*Id.* at ECF 803.) She opined that Plaintiff could sit for 45 minutes and stand for five minutes without interruption. (*Id.* at ECF 804.) Furthermore, Dr. Misra indicated that Plaintiff could sit for 45 minutes and stand for five minutes in an eight-hour work day, and required a cane to ambulate. (*Id.* at ECF 806.) Dr. Misra also concluded that Plaintiff could not walk a block, use public transportation, climb a few steps, or travel without a companion. (*Id.* at ECF 810.) Finally, Dr. Misra opined that given Plaintiff's injuries and weight, he could not be occupied in any field that required activity, adding "perhaps a sedentary job at a desk might be suitable for him." (*Id.* at ECF 804.)

On November 18, 2016, Plaintiff underwent a neurological examination conducted by Dr. Harold Tice. (*Id.* at ECF 25, 421, 1015–16.) As part of the examination, Plaintiff had an MRI

6

which revealed "multiple periventricular white matter and corpus callosum signal hyperintensities compatible with demyelination[7] in the setting and provided history of MS." (*Id.* at ECF 1016.) The study also revealed the presence of 19 new demyelinating plaques and two demyelinating plaques which had decreased in size from Plaintiff's last MRI on September 21, 2010. (*Id.*)

On March 8, 2016, Plaintiff met with orthopedist Dr. Roby Abraham at Brookdale Hospital for a follow-up. (*Id.* at ECF 25, 942–43.) Dr. Abraham found that Plaintiff's wounds had healed but that his range of motion was 20 to 90 degrees "due to stiffness and pain." (*Id.* at ECF 942.) Dr. Abraham recommended constant physical therapy and leg elevation. (*Id.* at ECF 943.)

On May 24, 2016, Plaintiff received his last physical therapy session on record. (*Id.* at ECF 817.) He demonstrated decreased range of motion, decreased muscle strength, and decreased mobility. (*Id.*) Walking more than five blocks, walking up more than twelve steps, and getting dressed continued to pose a problem for Plaintiff. (*Id.*) Plaintiff also reported feeling sharp pain, rating a four out of ten, at rest, and five out of ten when active. (*Id.*)

On July 7, 2017, Plaintiff was examined by Dr. Paul Kubiak, a board-certified orthopedist at the Brooklyn Island Musculoskeletal Care. (*Id.* at ECF 422, 1085–86.) Dr. Kubiak noted Plaintiff's right knee pain and left ankle pain. (*Id.* at ECF 1086.) Plaintiff's x-rays showed that there were degenerative changes on Plaintiff's right knee with joint space irregularity and osteophytes.[8] (*Id.* at ECF 1085–86.) Dr. Kubiak opined that the limited motion in the right knee was likely a result of "heterotopic ossification" and unlikely to be remedied by further surgery.

---

[7] "Demyelination refers to the loss or destruction of the protective covering (myelin sheath) that surrounds nerve fibers in the brain, optic nerves and spinal cord." *Valentin v. Berryhill*, No. 17-CV-944 (DFM), 2018 WL 4300119, at *4 n.10 (D. Conn. Sept. 9, 2018) (citing *Dorland's Illustrated Medical Dictionary* 493 (31st ed. 2007)).

[8] "Osteophytes are bony formations." *Mesimeris v. United States*, No. 03-CV-0925 (JS), 2006 WL 148911, at *2 n.2 (E.D.N.Y. Jan. 17, 2006).

(*Id.* at ECF 1086.) He also concluded that further surgeries would be unlikely to result in pain relief for Plaintiff. (*Id.*)

### III. Procedural History

On September 29, 2014, Plaintiff filed an application with the SSA for DIB, in which he alleged he had been disabled as of September 13, 2014. (*Id.* at ECF 19.) His application was denied. (*Id.*) After requesting a hearing (*id.*), Plaintiff appeared before Administrative Law Judge David Suna ("the ALJ") on September 19, 2016 and July 24, 2017 (*id.*). In a decision dated August 10, 2017, the ALJ determined that Plaintiff was not disabled and was therefore not entitled to DIB. (*Id.* at ECF 19–29.) Specifically, the ALJ found that Plaintiff was capable of sedentary work with several limitations and exceptions. (*Id.* at ECF 22.) On November 16, 2017, the ALJ's decision became final when the Appeals Council of the SSA's Office of Disability Adjudication and Review denied Plaintiff's request for review of the ALJ's decision. (*Id.* at ECF 5–10.) Thereafter, Plaintiff timely[9] filed the instant action.

---

[9] Title 42, United States Code, Section 405(g) provides that

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

"Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on November 21, 2017. Plaintiff filed the instant action on January 12, 2018—53 days later. (*See generally* Complaint, Dkt. 1.)

## IV. The ALJ decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled. In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 13, 2014 and that Plaintiff suffered from the following severe impairments: "multiple sclerosis ('MS'), optic neuritis, status-post motor vehicle accident causing left ankle fracture and bilateral knee dislocation, carpal tunnel syndrome, lumbar L2-L4 transverse process fracture[,] [] lumbar radiculopathy, and obesity." (Tr. at ECF 21.)

Having determined that Plaintiff satisfied his burden at the first two steps, the ALJ proceeded to the third step, at which the ALJ considers whether any of the claimant's impairments meet or equal one of the impairments listed in the Social Security Act's regulations (the "Listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. In this case, the ALJ concluded that none of Plaintiff's impairments met or medically equaled the severity of any of the impairments in the Listings. (Tr. at ECF 22.) Moving on to the fourth step, the ALJ

found that Plaintiff had the residual functional capacity ("RFC")[10] to perform "sedentary work" as defined in 20 C.F.R. § 404.1567(a).[11] (*Id.* at ECF 22–27.) Qualifying his RFC determination, the ALJ noted that Plaintiff

> can lift and carry 10 pounds occasionally, and less than 10 pounds frequently, and sit for six hours, and stand and walk two hours, in an eight-hour workday. The [Plaintiff] can push and pull occasionally, and can operate foot controls with the lower extremities occasionally. Additionally, the [Plaintiff] can frequently handle items, finger, feel, and reach in all directions with the dominant upper extremity; can never climb ramps, stairs, ladders, ropes, or scaffolds; can balance and stop occasionally; he is unable to kneel, crouch, or crawl. The [Plaintiff] is limited to performing occupations requiring no more than frequent depth perception; can never work from unprotected heights or with moving mechanical parts; he can occasionally operate a motor vehicle; he can tolerate up to loud noise. The [Plaintiff] requires a handheld assistive device at all times while walking, and requires a sit-stand option at will; the [Plaintiff] will be off-task 5% of the time in an eight-hour workday in addition to normal breaks.

(*Id.* at ECF 22.)

Relying on his RFC finding from step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work as a police guard. (*Id.* at ECF 27.) The ALJ then proceeded to step five. At step five, the ALJ must determine whether the claimant—given his RFC, age, education, and work experience—has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In this case, the ALJ determined

---

[10] To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1).

[11] According to the applicable regulations,

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

10

that there were jobs that existed in significant numbers in the national economy that Plaintiff was capable of performing, namely: (1) document preparer, which has an availability of 64,740 jobs; (2) call out operator, which has an availability of 46,320 jobs; and (3) food and beverage order clerk, which has an availability of 190,390 jobs. (Tr. at ECF 27–28.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotations and brackets omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) giving improper weight to the various medical opinions in the record (Pl.'s Br., Dkt. 12, at 2–4), (2) mis-categorizing several aspects of Plaintiff's testimony from the hearing (*id.* at 2, 4–6), and (3) failing to account for Plaintiff's location to

11

determine how many jobs in the national economy are available to him (*id.* at 6). The Court finds that remand is warranted based on Plaintiff's first argument because the ALJ failed to sufficiently develop the record to support his conclusions as to the medical opinions on which he relied. Since the Court grants remand on this ground, it does not address Plaintiff's other arguments.

**I.       Treating Physician Opinion**

"With respect to the nature and severity of a claimant's impairments, the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."[12]  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quotations, brackets, and citations omitted). As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reasons in her notice of determination or decision for the weight she gives [the] claimant's treating source's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citations, quotations, and brackets omitted).

Here, the ALJ gave Dr. Becker's assessment "only partial weight" because "[a]lthough Dr. Becker serves as [Plaintiff's] treating physician and is therefore familiar with the longitudinal progression of his impairments, his opinion appears to place excessive reliance on [Plaintiff's] subjective allegations and is inconsistent with the medical record as a whole." (Tr. at ECF 25.) This is erroneous for two reasons. First, it appears that the ALJ declined to give Dr. Becker's

---

[12] Although "[t]he current version of the [Social Security Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, which was initially filed on September 29, 2014, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); 20 C.F.R. § 404.1520(c).

assessment controlling weight, as required by the treating physician rule, because of Dr. Becker's "excessive reliance" on Plaintiff's subjective allegations. This is error. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [a treating physician] also relied on [a plaintiff]'s subjective complaints hardly undermines his opinion as to [a plaintiff's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (quotations, alternations, and citation omitted); *see also Mahon v. Colvin*, No. 15-CV-398 (FPG), 2016 WL 3681466, at *4 (W.D.N.Y. July 6, 2016) (holding that "reliance on [a p]laintiff's subjective complaints is not a valid reason for rejecting [a consultative doctor]'s medical opinion").

Second, once the ALJ concluded that Dr. Becker's medical opinion was "inconsistent with the medical record as a whole" (Tr. at ECF 25), the ALJ was obligated to "seek clarification and additional information from [Dr. Becker] to fill any clear gaps before dismissing the doctor's opinion." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quotations and brackets omitted). This is especially true where, as here, the treating physician's opinion was rendered before a significant medical event, *i.e.*, Plaintiff's August 2014 accident which occurred after Dr. Becker memorialized his medical opinions in the Multiple Impairment Questionnaire. Before the ALJ can disregard a treating physician's medical opinion, the ALJ must first ask the treating physician to clarify the deficiencies the ALJ perceives in that opinion. *See Braga v. Comm'r of Soc. Sec.*, No. 18-CV-1345 (PKC), 2019 WL 4083047, at *6 (E.D.N.Y. Aug. 29, 2019). Furthermore, while an ALJ is entitled to disregard the opinion of a claimant's treating physician after giving the physician the opportunity to correct the deficiencies in his or her medical reports, the ALJ must make clear that this decision is based on conclusions made by other medical professionals. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted

to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Hillsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.").

The Court concludes that remand is therefore required to enable the ALJ to solicit the necessary information from Dr. Becker to address the perceived deficiencies in his medical reports.[13] As courts in this Circuit have held, "the ALJ must make every reasonable effort to help an applicant get medical reports from his medical sources" and "must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada*, 753 F. Supp. 2d at 269 (quotations and brackets omitted); *see also Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 (S.D.N.Y. 2015) ("Legal errors regarding the duty to develop the record warrant remand.") (collecting cases).

## II. Consultative Opinions

The record before the ALJ also included the medical opinions of two consultative examiners: Drs. Lamberto Flores, an internal medicine specialist, and Mahendra Misra, an orthopedist. (Tr. at ECF 4, 801.) The ALJ gave "partial weight" to Dr. Misra's March 2016 medical opinion that Plaintiff "is unable to lift even minimal weight, and is restricted to sitting and standing less than one hour in an eight-hour workday," finding that Dr. Misra's opinion is

---

[13] Additionally, given the inconsistencies in the record as to whether Plaintiff's treating physician was Dr. Marvin Becker or Dr. Gary Becker, as noted *supra* n.3, the ALJ should solicit the necessary information to confirm who Plaintiff's treating physician was.

"internally inconsistent" and that "the medical record as whole, which . . . indicates a trend improvement in the claimant's condition, does not adequately support his opinion." (Tr. at ECF 26.) However, the ALJ gave Dr. Flores's February 2015 medical opinion "significant weight" because, though noting that the opinion is "somewhat vague, it is supported by clinical findings elicited in the course of a live examination and is generally consistent with the record as a whole." (*Id.*) In choosing to elevate Dr. Flores's medical opinion over the opinions of Plaintiff's treating physician and Dr. Misra, the ALJ failed to adequately explain how Dr. Flores's opinion was "more consistent with the underlying medical evidence" than the opinions of Drs. Becker and Misra. *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015). Specifically, the ALJ both (1) failed to fulfill his affirmative obligation to develop the record upon finding deficiencies in the medical reports, and (2) failed to adequately explain why Dr. Flores's opinion was more credible than the opinions of Drs. Becker and Misra.

First, the ALJ, in describing the opinions of both Drs. Misra and Flores, identified deficiencies in both. For example, in Dr. Misra's report, the ALJ noted that his opinion was "internally inconsistent" because "[d]espite stating that [Plaintiff] is unable to sit for even one hour in an eight-hour day, he elsewhere stated that [Plaintiff] may be able to perform a sedentary desk job." (Tr. at ECF 26 (internal quotations omitted).) Likewise, though the ALJ afforded Dr. Flores's opinion "significant weight," the ALJ also noted that the "opinion is somewhat vague." (*Id.*) In both instances, once the ALJ noted these deficiencies, he had the obligation to develop the record. *See Calzada*, 753 F. Supp. 2d at 269.

Second, the ALJ gave greater weight to the opinion of Dr. Flores—a consultative examiner—than the opinion of Plaintiff's treating physician, Dr. Becker, or the more recent consultative medical opinion of Dr. Misra without sufficiently explaining why Dr. Flores's opinion

15

was more consistent with the record as whole. Dr. Flores examined Plaintiff in February 2015 (*see* Tr. at ECF 26; *see also id.* at ECF 296) and concluded that Plaintiff "on physical examination[,] is limited in fully squatting, toe walking even with the cane . . . [and] is limited in prolonged walking, sitting, standing, climbing stairs, and heavy lifting." (Tr. at ECF 798.) The ALJ noted that though Dr. Flores's

> opinion is somewhat vague, it is supported by the clinical findings elicited in the course of a live examination and is generally consistent with the record as a whole, which indicates that [Plaintiff]'s impairments have some impact [on] his ability to perform the above[-]mentioned functions, but that he has seen improvement in his condition following surgery and follow-up physical therapy.

(Tr. at ECF 26.) In contrast, the ALJ only gave partial weight to Drs. Becker's and Misra's opinions—finding, in relevant part, that Plaintiff could not stand/walk or sit for more than one hour during an eight-hour workday (*id*. at ECF 517–18), could only sit for 45 minutes and stand for five minutes during an eight-hour workday (*id*. at ECF 804), and could not walk a block, use public transportation, or travel without a companion (*id*. at ECF 810)—because they, *inter alia*, were inconsistent with the record that showed this improvement, *e.g.*, Plaintiff's report that "he ha[d] recently been working out [at] a gym."[14] (Tr. at ECF 25; *see also id.* at ECF 26.) Without more elaboration, this analysis is insufficient. First, the ALJ relies heavily on the idea that "the medical record as a whole . . . indicates a trend improvement in [Plaintiff]'s condition" in finding that Dr. Flores's opinion is more consistent with the record. (Tr. at ECF 26; *see also id.* at ECF

---

[14] However, even this fact did not support the conclusion that Plaintiff's condition was improving. Plaintiff's medical records indicated only that he was "working out in the gym" (*see, e.g.*, Tr. at ECF 942), and Plaintiff testified that he would go to the gym to "work[] out my upper body, so that [he] could try to alleviate using [his] legs to help [him] stand up," (*id.* at ECF 48). Plaintiff further testified that in terms of working out his lower body, "the muscle wasn't going to allow [him] to do much. [He] couldn't do leg—forward leg movements, lift weights or anything like that. The only thing [he], pretty much, did was the therapeutic bike ride, which was, perhaps, less than five or seven minutes." (*Id.* at ECF 48–49.)

25 (noting the same in his analysis of Dr. Becker's opinion); *id.* at ECF 26 (noting the same as to Dr. Misra's opinion).) However, Dr. Flores's opinion, from February 2015, comes chronologically between the opinions of Dr. Becker, from August 2014 and Dr. Misra, from March 2016, both of which found significant limitations in Plaintiff's ability to walk, sit, and stand.[15] As a result, it appears that Dr. Flores's opinion, at most, indicated a brief interlude of improvement over a long history of continued, severe impairment. If the medical record does not in fact support such a conclusion as to Plaintiff's overall lack of progress, the ALJ must provide more concrete and substantive analysis to demonstrate why that is the case. *Cf. Caternolo v. Astrue*, No. 11-CV-6601 (MAT), 2013 WL 1819264, *9 (W.D.N.Y. Apr. 29, 2013) ("[I]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination.") (quotations omitted) (collecting cases).

Moreover, to the extent that the ALJ believed the record indicated a "trend improvement" in Plaintiff's condition—despite none of three medical opinions the ALJ relies on reaching such a conclusion—the Court finds it odd that the ALJ did not consider the most recent medical records from Dr. Kubiak who examined Plaintiff on July 7, 2017. Plaintiff was referred to Dr. Kubiak, an orthopedist, by his primary care physician. (Tr. at ECF 42, 46.) Dr. Kubiak, after a physical examination, found that "there is a high likelihood that [Plaintiff] will have chronic pain in relation to [his] injuries" and that any surgery "is unlikely to provide a significant improvement in [Plaintiff's] knee range of motion at this stage post injury." (*Id.* at ECF 1086.) Dr. Kubiak's conclusions that at least some of Plaintiff's conditions are likely to be chronic belie the notion that his medical record shows a "trend improvement." (*Cf. id.* at ECF 974 (observing, in Plaintiff's

---

[15] Curiously, in describing the opinions of these three doctors, the ALJ, in his written decision, went out of order chronologically, describing Dr. Flores's opinion last. (*See* Tr. at ECF 25–26.)

last physical therapy notes, that as of May 2016, Plaintiff "demonstrate[d] decreased [range of motion], decreased [m]uscle Strength, decreased [m]obility" and that he would benefit from protocols to "restore prior level of function").)

The Court is, of course, required to defer the ALJ's resolution of contradicting evidence. *Cage*, 692 F.3d at 122 (noting that a court must "defer to the Commissioner's resolution of conflicting evidence"). But where, as here, the ALJ has failed to adequately consider and reconcile contradictory evidence to support his conclusions, remand is appropriate. *See Grosso v. Colvin*, No. 15-CV-8709 (AT) (GWG), 2016 WL 4916968, at *9 (S.D.N.Y. Sept. 14, 2016) (holding that, even where "the ALJ made extensive efforts to evaluate the conflicts between [the opinion of the claimant's] treating physician . . . and the opinions of consultative examiners," remand was nevertheless appropriate "because of certain errors reflected in the ALJ's decision regarding the weight to be accorded to the consultative examiners"), *report and recommendation adopted*, 2016 WL 6269604 (S.D.N.Y. Oct. 25, 2016); *Wilson v. Colvin*, No. 15-CV-6316 (JWF), 2016 WL 5462838, at *12 (W.D.N.Y. Sept. 28, 2016) (remanding where "the ALJ's decision to credit the opinion of the consultative examiner over plaintiff's treating physicians [was], as best the Court can tell from the record, an arbitrary one").

\* \* \*

In sum, the Court finds that remand is necessary to enable the ALJ to obtain enough information to determine whether the opinion of Dr. Becker—Plaintiff's treating physician—is entitled to controlling weight. *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) ("[W]here we are unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ, we will not hesitate to remand for further findings or a clearer explanation for the decision.") (quotations and citation

omitted). Although Dr. Becker's medical opinion is not itself "determinative," his opinion is entitled to "controlling weight," so long as the ALJ had enough information to determine that it was "well supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence." *Green-Younger*, 335 F.3d at 106; *see also Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike the judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.") (quotations, ellipsis, and citation omitted).

If, after soliciting the necessary information on remand, the ALJ determines that the opinions of Drs. Becker and Misra are still entitled to little weight, he must adduce evidence from a medical professional to support that conclusion. *See Greek*, 802 F.3d at 375. In doing so, the ALJ should keep in mind that he "may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence." *Mayor v. Colvin*, No. 15-CV-344 (AJP), 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015); *see also Suarez*, 102 F. Supp. 3d at 577 (noting that the ALJ is free to give greater weight to consultative medical examiners' opinions so long as he documents his rationale for finding the relevant standards met).

## CONCLUSION

For the reasons set forth above, the Court denies the Commissioner's motion for judgment on the pleadings and grants Plaintiff's cross-motion. The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2019
       Brooklyn, New York